# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TERRI MATOUSEK, as the ) Personal Representative of the Estate ) of John C. Matousek, Deceased, ) ) Plaintiff, ) ) vs. ) ) ) (1) CITY OF WAUKOMIS, ) a municipal corporation; ) ) (2) MARSHALL WOODSON, ) in his individual and ) official capacities; ) ) (3) REID GAINES, ) in his individual and ) official capacities; ) ) ) Defendants. ) | Case No. CIV-19-151-R |

## COMPLAINT

Plaintiff Terri Matousek, as the Personal Representative of the Estate of John C. Matousek, Deceased, for her causes of action against Defendants City of Waukomis, a municipal corporation, Marshall Woodson, in his individual and official capacities, and Reid Gaines in his individual and official capacities alleges and states:

1

The Parties

1. John Charles Matousek was born on June 15, 1952.

2. At the time of his death on February 18, 2017, Mr. Matousek was 64 years old.

3. Before his death, Mr. Matousek was a resident of Kingfisher County, State of Oklahoma which is located within the Western District of Oklahoma.

4. Plaintiff Terri Matousek is the wife of Mr. Matousek and the duly-appointed Administrator of the Estate of John C. Matousek, Deceased as reflected in the Letters Testamentary filed in the District Court of Kingfisher County, *Case No. PB-2018-118*.

5. Plaintiff Terri Matousek is a resident of the Kingfisher County, State of Oklahoma, which is located within the Western District of Oklahoma.

6. Defendant City of Waukomis ("City") is and at all relevant time has been a municipal corporation organized under the laws of the State of Oklahoma. City's principal place of business and operation is located within the Western District of Oklahoma.

7. Upon information and belief, Defendant Officer Marshall Woodson is a resident of Garfield County which is located within the Western District of

Oklahoma. During all relevant times described herein he was acting under color of law.

8. Upon information and belief, Defendant Officer Reid Gaines is a resident of Garfield County which is located within the Western District of Oklahoma. During all relevant times described herein he was acting under color of law.

9. At the time of the events described herein, Officer Woodson was employed as full time officer of the Waukomis Police Department before the events described herein.

10. At the time of the events described herein, Officer Gaines was employed as full time officer of the Waukomis Police Department before the events described herein.

## Jurisdiction and Venue

11. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because the claims alleged arise under the Constitution and laws of the United States of America and pursuant to 42 U.S.C. § 1983.

12. This Court has personal jurisdiction over all the defendants because they are either political subdivisions of the State of Oklahoma or citizens of the State of Oklahoma.

13. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) in that the defendants reside in the Western District of Oklahoma and a substantial part of the events giving rise to the claim occurred in the Western District of Oklahoma.

Fact Allegations

14. On February 18, 2017, Officer Marshall Woodson ("Woodson") and Officer Reid Gaines ("Gaines") were full time police officers for the Waukomis Police Department.

15. On the evening of February 18, 2017, Woodson and Gaines were on patrol within the City of Waukomis, which includes portions of U.S. Highway 81.

16. U.S. Highways 81 runs North and South and connects the towns of Enid, Oklahoma and Waukomis, Oklahoma.

17. At approximately 9:59 pm on February 18, 2017, Woodson and Gaines were monitoring radio traffic of the Enid 911 emergency radio dispatcher.

18. While monitoring Enid Police Department's radio traffic, Woodson and Gaines were informed of a developing "road rage" incident in Enid.

19. Woodson and Gaines learned from the radio traffic that a local Enid resident—Mark Chandler ("Chandler")—had reported that a Blue Mitsubishi (the

driver later identified as Beki Bajo ("Bajo")) was driving erratically along Van Buren Road in Enid, Oklahoma.

20. As Woodson and Gaines continued to monitor the ongoing situation in Enid they learned that Bajo had reportedly attempted to run Chandler off the road.

21. After Bajo's first attempted collision, Chandler told Enid's 911 dispatch that he would be proceeding to a Hutch's gas station ("Hutch's") and requested that an Enid police officer meet him there.

22. As Chandler proceeded to Hutch's, he noticed that Bajo was following close behind him. When Chandler arrived at Hutch's he pulled into a gas pump stall.

23. Bajo made an attempt to follow Chandler into the same gas pump stall as a continued effort to threaten, frighten, and potentially harm Chandler.

24. As Bajo attempted to enter the stall, Chandler left Hutch's and began travelling South on Van Buren Road (Van Buren Road turns into U.S. Highway 81).

25. After leaving Hutch's, Chandler noticed that Bajo was still following him. As Chandler drove over the overpass on Van Buren Road, Bajo attempts—for the third time—to crash his vehicle into Chandler's vehicle.

26. After the third attempted collision, Chandler saw Bajo pull into the turnout for the Sunridge Apartments located on U.S. Highway 81 in Enid. After

seeing Bajo turn into the turnout, Chandler continued southbound on U.S. Highway 81.

27. As Chandler looks back in his review mirror, he notices Bajo's vehicle traveling southbound in the northbound lanes of U.S. Highway 81.

28. Woodson and Gaines had been monitoring the entirety of the "road rage" incident between Chandler and Bajo.

29. At or around 10:05 pm, Woodson and Gaines overheard an Enid patrolman inform Enid dispatch to notify the Waukomis Police Department to be on the lookout for Bajo, based on his location and direction of travel as he left Enid.

30. At this point Woodson and Gaines had been monitoring the ongoing situation between Chandler and Bajo for approximately five minutes. While monitoring radio traffic, both Woodson and Gaines were able to deliberately and thoughtfully consider the potential danger of antagonizing and provoking Bajo into a high speed pursuit and creating a dangerous situation for themselves and others operating their motor vehicles on the road ways.

31. In their time monitoring the ongoing "road rage" situation between Chandler and Bajo, Woodson and Gaines had significant time to deliberately and thoughtfully consider Bajo's propensity to intentionally injure a third-party motorist by his previous attempts to use his vehicle as a weapon.

32. Woodson interjected himself into a potential confrontation with Bajo as he radioed the Garfield County Sheriff's dispatch to advise that he was in route to see if he could locate Bajo.

33. At approximately 10:06 pm, Woodson noticed a vehicle driving South in the Northbound lanes of U.S. Highway 81. The vehicle matched the description of the vehicle that had been reportedly trying to crash in to Chandler.

34. Upon information and belief, when Woodson encountered Bajo they were outside the city limits of Waukomis, and thus outside his jurisdiction as a Waukomis police officer.

35. At or around the approximate time that Woodson encountered Bejo's vehicle, John Matousek ("Mr. Matousek") was driving South on U.S. Highway 81 in the location of Woodson, Gaines, and Bajo.

36. Mr. Matousek was a graduate of West Point and a 22 year veteran of the United States army. Mr. Matousek retired from the army with a rank of Lieutenant Colonel.

37. While in the army, Mr. Matousek joined a program known as "troops to teachers," which eventually led to Mr. Matousek taking a teaching position within the Chisolm school system in Enid, Oklahoma.

38. On February 18, 2017, Mr. Matousek had driven from his home to watch Chisolm's high school basketball team compete in the state payoffs. At or around 9:30 pm, Mr. Matousek left the Chisolm high school basketball game to return to his home in Hennessey, Oklahoma.

39. The route Matousek used to return home required him to drive southbound down U.S. Highway 81.

40. As Bajo approached Woodson, he was approaching from a southerly direction in the northbound lanes at a slow rate of speed and in a controlled manner.

41. As Bajo got close to Woodson's patrol car, Woodson activated his emergency lights and attempted to stop Bajo. Bajo did not stop but continued driving at a slow rate of speed past Woodson's patrol car.

42. After passing Woodson's patrol car, Bajo continued driving at a slow rate of speed South down U.S. Highway 81, in the Northbound lanes.

43. Gaines, who had positioned his patrol vehicle behind Woodson's, also activated his emergency lights in an attempt to stop Bajo. Again, Bajo drove past Gaines' patrol vehicle at a slow rate of speed.

44. After passing both Woodson and Gaines, Bajo continued driving slowly down U.S. Highway 81 in a southerly direction, while in the northbound lanes.

45. Although Bajo was operating his motor vehicle on the wrong side of the road, Bajo was not attempting to cause a collision with other motorists on the roadway.

46. When Bajo passed both Woodson and Gaines, Woodson made the decision to call in an official pursuit.

47. Prior to initiating the high speed pursuit of Bajo, Woodson and Gaines had time to thoughtfully consider if their actions in initiating a pursuit would provoke Bajo and his displayed propensity to intentionally crash his vehicle into other third-party motorists.

48. At the time Woodson called in the pursuit, he and Gaines had been monitoring radio traffic concerning Bajo for several minutes. During the several minutes of monitoring radio traffic, Woodson and Gaines were able to make unhurried judgments and reflect upon the certain dangers that a high speed pursuit with Bajo would pose to third-party motorists.

49. After calling in the pursuit, both Woodson and Gaines made U-turns and began pursuing Bajo. Woodson pursued Bajo in the south bound lanes of traffic and Gaines began pursuing Bajo in the northbound lanes.

50. Prior to Woodson and Gaines making contact with Bajo he was driving at a slow rate of speed and in a relatively controlled manner. However, when

Woodson and Gaines made the deliberate and calculated decision to initiate a pursuit of Bajo—he immediately increased his speed and began driving recklessly.

51.     As Woodson and Gaines continued to pursue Bajo down U.S. Highway 81, Bajo increased his speed and began to drive in an aggressive and reckless manner.

52.     As Bajo neared the intersection of U.S. Highway 81 and Skelton Road with Woodson and Gaines continuing to agitate his hostile and wreckless driving behavior, Bajo abruptly turned into the center median, hit a road sign, and began traveling northbound in the southbound lanes.

53.     As Bajo crossed the median into the southbound lanes, Woodson, while having time to deliberate and consider his next action, took up a position directly behind Bajo and Gaines took a parallel position—pursuing Bajo in the northbound lanes. The actions of Woodson and Gaines continued to agitate Bajo causing him to increase his speed at times reaching over 80 mph.

54.     Woodson and Gaines made a conscious, thoughtful and deliberate decision to continue the pursuit despite the increasing danger to third-party motorists.

55.     At or around 10:08 pm, Matousek was driving south on U.S. Highway 81, near the intersection of U.S. Highway 81 and Skeleton Road.

56. Matousek noticed Woodson's emergency lights and pulled over to the shoulder of U.S. Highway 81.

57. At or around 10:09 pm, as Bajo and Woodson approached Matousek's position, Bajo turned his vehicle towards the shoulder and hit Matousek's vehicle head on.

58. Bajo's impact was so severe that it caused both vehicles to go into a spin. Matousek's vehicle came to rest on the west shoulder of the southbound lanes facing southwest.

59. Matousek suffered multiple blunt force injuries, including: fractures of cervical and thoracic spine, multiple ribs, right wrist, pelvis, right tibia, left femur, and left tibia and fibula.

60. Matousek was pronounced dead at the scene of the accident as a direct and proximate result of Woodson and Gaines making a deliberate, calculated, and well thought out decision to initiate and continue a high speed pursuit with an unstable individual, who had a well-documented history of using his vehicle to cause injury to other motorists.

61. Both Woodson's and Gaines' patrol vehicles were equipped with dashboard cameras. During the pursuit of Bajo, Woodson's camera picks up the voice of an additional female passenger in his patrol vehicle.

62. Upon information and belief, the unidentified female passenger was Woodson's wife.

63. Upon information and belief, Woodson violated the policies and procedures of the Waukomis police department by initiating and continuing a high speed pursuit while transporting a non-commissioned police officer.

64. Upon information and belief, Woodson and Gaines violated the policies and procedures of the Waukomis Police Department by pursuing Bajo on the wrong side of U.S. Highway 81.

65. Woodson's and Gaines' willful and deliberate violations of Waukomis Police Department's policies and procedures represents deliberate indifference towards Matousek's life, and conscious shocking behavior.

## FIRST CAUSE OF ACTION

### Substantive Due Process in Violation of 42 U.S.C. §1983
### Against Officer Woodson and Officer Gaines

66. Plaintiff incorporates paragraphs 1–65 as if specifically alleged herein.

67. The law was clearly established at the time of Officer Woodson's and Officer Gaines' actions as described herein.

68. In *Green v. Post*, 574 F.3d 1294 (2009) the Tenth Circuit codified the clearly established legal authority that the intent-to-harm standard applies in rapidly

evolving, fluid and dangerous high speed pursuits where a law enforcement officer does not have the luxury of calm and reflective deliberation.

69.     *Green v. Post, supra.,* also established the clear legal authority in the Tenth Circuit that a deliberate indifference standard applies in circumstances like those observed by Officer Woodson and Officer Gaines on February 18, 2017. Officer Woodson's and Officer Gaines' actions were the result of the luxury of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations.

70.     Officer Woodson's and Officer Gaines' actions as described herein violated the Constitutional Rights of John C. Matousek.

71.     The law was clearly established by the Tenth Circuit at the time of the events described herein by the legal precedent articulated in *Green v. Post, supra.*

72.     Based on the holding and legal authority reasoned by the Tenth Circuit in *Green v. Post,* which was decided in 2009, it would be clear to Officer Woodson and Officer Gaines that their conduct on the evening of February 18, 2017 as described herein, was unlawful under the circumstances.

73.     Officer Woodson and Officer Gaines knew on February 18, 2017 that their deliberate and indifferent actions as described and pleaded herein created an extreme great risk of serious injury to someone in Mr. Matousek's position.

74. As described and plead herein, Officer Woodson and Officer Gaines were subjectively aware of a substantial risk of serious harm to someone in Mr. Matousek's position.

75. The deliberate and calculated actions by Officer Woodson and Officer Gaines as described herein are of such a nature as to shock the conscience due to the luxury of time afforded to Officer Woodson's and Officer Gaines decision making process.

76. The deliberate and calculated actions by Officer Woodson and Officer Gaines as described herein are of such a nature as to shock the conscience due the fact that they first had the time and opportunity to reflect upon their actions during the evening of February 18, 2017.

77. As a direct and proximate result of the state of actions by Officer Woodson and Officer Gaines, Mr. John C. Matousek sustained physical injuries, mental injuries, medical expenses, lost wages and ultimately his death.

78. Terry Matousek, as the Personal Representative of the Estate of John C. Matousek, Deceased, will seek to recover all the rights and remedies provided under 42 U.S.C. §1983.

WHEREFORE, Terri Matousek, as the Personal Representative of the Estate of John C. Matousek, Deceased, prays for judgment against Officer Woodson and Officer Gaines as follows:

(1)   For actual damages in sum in excess of $75,000 and in accordance with the proof at the time of trial;

(2)   For all those damages afforded to the Estate of John C. Matousek for his wrongful death as provided by statute or law in an amount in excess of $75,000 and in accordance with the proof at the time of trial:

(3)   For punitive and exemplary damages as determined by the jury at the time of trial;

(4)   For interest thereon as provided by law;

(5)   For the costs and expert fees as provided by 42 U.S.C §1988;

(6)   For any other such and further relief as the Court deems just and proper, whether that is specifically requested herein or requested at a later date.

## SECOND CAUSE OF ACTION

## VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANT CITY

79.   Plaintiff incorporates by reference paragraphs 1 - 78 as though set forth in full herein.

80. Officer Woodson and Officer Gaines violated Mr. Matousek's substantive due process rights when they made a conscious and well thought out decision to agitate and provoke Bajo into a high speed pursuit, although he had displayed the propensity to use his vehicle to intentionally injure third-party motorists; initiated and continued a high speed pursuit of Bajo in the wrong lanes of traffic; and initiated a high speed pursuit with a non-commissioned police officer present in Officer Woodson's patrol vehicle.

81. The initiation and continuance of a high speed pursuit is a usual and recurring situation for law enforcement officers employed by Defendant City. Defendant City's Police Officers may, at any given time, have a need to initiate a pursuit of a suspect.

82. It is plainly obvious that a law enforcement officer employed by Defendant City should not initiate and continue a high speed pursuit with a suspect who has a documented history of using his vehicle to injure third-party motorists, as antagonizing a suspect, such as Bajo, with this propensity is an obvious danger to officer safety and the motoring public.

83. It is plainly obvious that a law enforcement officer employed by Defendant City should not initiate and continue a high speed pursuit in the wrong lanes of traffic, or initiate a high speed pursuit with a non-commissioned police

officer in the vehicle, as it is an obvious danger to officer safety and the motoring public.

84. Defendant City's complete lack of training and/or inadequate training of its officers in the initiation, continuance, procedures, and protocols of high speed pursuit situations constitutes deliberate indifference towards the motoring public in general. Therefore, Defendant City's final policy-makers knew with certainty that police officers that have a complete lack of training and/or inadequate training for high speed pursuit situations, makes it highly predictable or plainly obvious that violations of the motoring public's constitutional rights will occur.

85. Despite this knowledge, Defendant City does not adequately train its officers that it is inappropriate to antagonize a suspect, with the propensity to use his vehicle to intentionally injure third-party motorists, into a high speed pursuit.

86. Despite this knowledge, Defendant City fails to train its officers on the proper protocols and procedures when initiating and continuing a high speed pursuit. Defendant City's training should, at the very least, flatly prohibit police officers from participating in high speed pursuits in the wrong lanes of traffic. And, Defendant City should flatly prohibit any officer from participating in a pursuit while in the company of a non-commissioned police officer. By failing to train officers for high speed pursuit situations, Defendant City has acted as the moving force of the

constitutional violation that occurred in this instance, as it was apparent that an officer should not engage a suspect, with the propensity to injure third-party motorists, in the wrong lanes of traffic. As it is also apparent that an officer should not engage in a high speed pursuit while accompanied by a non-commissioned police officer. If Defendant City would have provided the appropriate training to Officer Woodson and Officer Gaines, the constitutional violation would not have occurred.

87. The dangers posed by inadequate training of police officers on procedures and protocols for a high speed pursuit, is so obvious that Defendant City's failure to train Officer Woodson and Officer Gaines, as stated above, can be properly characterized as deliberate indifference to constitutional rights.

88. As a direct and proximate result of Defendant City's failure to train Officer Woodson and Officer Gaines, Mr. John C. Matousek sustained physical injuries, mental injuries, medical expenses, lost wages and ultimately his death.

89. Terri Matousek, as the Personal Representative of the Estate of John C. Matousek, Deceased, will seek to recover all the rights and remedies provided under 42 U.S.C. § 1983.

WHEREFORE, Terri Matousek, as the Personal Representative of the Estate of John C. Matousek, Deceased, prays for judgment against the City as follows:

(1) For actual damages in sum in excess of $75,000 and in accordance with the proof at the time of trial;

(2) For all those damages afforded to the Estate of John C. Matousek for his wrongful death as provided by statute or law in an amount in excess of $75,000 and in accordance with the proof at the time of trial:

(3) For punitive and exemplary damages as determined by the jury at the time of trial;

(4) For interest thereon as provided by law;

(5) For the costs and expert fees as provided by 42 U.S.C §1988;

(6) For any other such and further relief as the Court deems just and proper, whether that is specifically requested herein or requested at a later date.

        WARD & GLASS, L.L.P.

        s/Tanner B. France
        Stanley M. Ward, OBA#9351
        Woodrow K. Glass, OBA#15690
        Tanner B. France, OBA#33171
        Barrett T. Bowers, OBA#30493
        1601 36th Ave NW
        Norman, Oklahoma 73072
        (405) 360-9700
        (405) 360-7902 (fax)
        ATTORNEYS FOR PLAINTIFFS

JURY TRIAL DEMANDED
ATTORNEYS' LIEN CLAIMED